## Bentley v. Rochester Planing Mill Company, Appellant.

*Master and servant—Contributory negligence—Planing mill.*

In an action by an employee against his employer, a planing mill company, to recover damages for personal injuries, it appeared that the plaintiff, a man of mature years, who had been in the service of the defendant for several years, was foreman of the planing mill, machine hands and carpenters, with the right to hire and discharge men, and with general control over his' department. On the main floor of the mill there was a saw intended for a special use. It was operated by a belt from the basement and could be detached from the general system of power by throwing the belt in the basement. When the saw was to be used it was necessary for someone to go to the basement and restore the broken connection. On the day of the accident a superior officer of the plaintiff told him that he wished to have some lumber sawed up by the special saw. He said: "When you have time, I wish you would do that." Plaintiff said: "If I have to do it, I might as well do it now as at any other time." Plaintiff then proceeded to slacken the speed of the running machinery, which he could do by an apparatus on the first floor. After this he went down into the basement, which was separate from his own department and apart from his control, and which

he did not often visit, and while attempting to adjust the belt of the special saw was caught in his clothing by a set screw projecting from the shaft revolving near the belt, and was injured. *Held*, that the plaintiff was not entitled to recover, as the proximate cause of the injury was his own lack of care.

Argued May 12, 1908.   Appeal, No. 48, April T., 1908, by defendant, from judgment of C. P. Beaver Co., June T., 1906, No. 26, on verdict for plaintiff in case of William M. Bentley v. Rochester Planing Mill Company.   Before RICE, P. J., PORTER, HENDERSON, MORRISON, ORLADY, HEAD and BEAVER, JJ.   Reversed.

Trespass to recover damages for personal injuries.   Before PATTON, P. J.

The facts are stated in the opinion of the Superior Court.

Verdict and judgment for plaintiff for $1,500.   Defendant appealed.

*Error assigned* was in refusing binding instructions.

*Forest G. Moorhead* and *Edwin S. Weyand,* for appellant, cited: Delaware River Iron-Ship Building Co. v. Nuttall, 119 Pa. 149; Andersen v. Berlin Mills Co., 88 Fed. Repr. 944; Roonty v. Sewall & Day Cordage Co., 161 Mass. 153 (36 N. E. Repr. 789); Demers v. Marshall, 178 Mass. 9. (59 N. E. Repr. 454).

*James L. Hogan,* with him *John M. Buchanan, John B. Chapman* and *Walter P. Rainbow,* for appellee.

OPINION BY HEAD, J., February 26, 1909:

Although, as to some features of this case, the testimony developed at the trial was conflicting, there are certain facts which appear so plainly, even from the evidence delivered by the plaintiff himself, that they may be fairly said to be undisputed.   It is from a consideration of these facts alone we must determine whether or not the learned trial judge fell into error in submitting the whole case to the jury and entering judgment for the plaintiff on the verdict.

The main floor of the defendant's mill was occupied by the

machinery that is characteristic of that particular kind of a plant, planers, saws, etc.; whilst the basement accommodated the general machinery intended to develop and supply power. Upon the main floor stood a saw, designed for a special use, which was so constructed that, when not in use, the power operating it could be detached from the general system by throwing a belt in the basement. When the saw was to be used it was necessary for someone to go to the basement and restore the broken connection.

At the time of his injury the plaintiff was a man of mature years. He had spent most of his active life working in and about planing mills and had acquired knowledge and skill in the use of the machinery operated in such plants. He had worked for the defendant company, at two separate periods, aggregating several years. He had risen to a position of authority and responsibility in its service. He says he was "foreman of the planing mill, machine hands and carpenters." That he had the right to hire and discharge men—at least those who worked the machinery on the main floor—and designate and direct their work, he does not deny. Had it become his duty, in hiring a new man, to explain to him the nature of any of the machines, or the danger that might be incurred in operating them, his competency for that purpose and the fitness of his selection by the defendant, would be established by his own testimony.

Assuming, as the plaintiff contends, that Mr. Throne was, in a general way, his superior officer—although his activities were usually confined to matters outside the mill—his own position and duties are thus defined by himself: "I was foreman; it was my place to do what I was told or to have it done, with that portion that I had anything to do with. If there was any orders came in for work, they were generally handed to me; sometimes they were handed to other people, but they generally came to me; and it was my place to hand them over to the people best suited to get that out." It is thus apparent that he was invested with the right to use his own judgment and determine for himself in what way the "orders for work" could be best executed.

The plaintiff testifies that on the morning of the accident Mr. Throne came to him and said, "William, there is some stuff over there at the planer, which I wish you would have planed up and sawed into boards,—split. I believe he said, 'When you have time I wish you would do that.' I said: 'If I have to do it, I might as well do it now as any other time.' And in order to do this I had to start the re-saw." This is the plaintiff's statement of what he now alleges to have been an order from his superior officer that sent him into a place, to wit: the basement, where he was obliged to encounter a danger unknown to him, but which was or should have been known to his superior. We are unable to see how such a conclusion can be justly drawn from the premises. There was no order to the plaintiff that he should himself even operate the saw, which was admittedly in the department of the mill over which he exercised authority, much less was there any direction to him to go into the basement, which, with the machinery in it, he now alleges was outside his sphere of control. After admitting that he could have designated anyone in the mill to do the sawing instead of doing it himself, the plaintiff was asked, "Q. And you of your own accord, in sawing that, went to the basement and put on the belt?" to which he replied, "A. Yes, sir." Thus it appears the act of the plaintiff in going to the basement to start the saw was the result of the exercise of his own judgment and discretion and not of an order or command from his superior officer.

Again, the plaintiff's testimony shows that the speed of the running machinery could be controlled at will by an apparatus, called "a tightener," which was "upon the first floor." He does not undertake to say he was not perfectly familiar with the use and effect of this, but states that "when you want to slow or stop the machinery, you pull the tightener back." Before going to the basement he undertook to use this plain precaution for his own safety. He admits he could thus have stopped the machinery entirely until he had gone below and adjusted the belt that would give power to operate the saw. This would have made his work with the belt absolutely free from danger. There was nothing to prevent his doing so except his own conclusion that when he had "slackened the shaft

down considerably," he had done all that was necessary for his own safety.

In attempting to adjust the belt his clothing was caught by a set screw in the shaft revolving near the belt and thus the accident occurred. That such a shaft would revolve in a cap or collar and be held there by a set screw, the plaintiff well knew because he explained to the jury the reason for such construction. Let it be conceded, as he contends, that where a shaft is located as this one was, the set screw should be countersunk, or if projecting should be guarded so that accidental contact with it would be prevented, what conclusion follows?

At the trial in court the plaintiff produced a model, of the portions of the machinery involved in the accident, to show to the jury how the injury occurred. He had never seen the original since the day he was hurt. The model was made by himself from memory. Whilst he did not claim that it was a precise and accurate reproduction, he alleged it was a "fair representation of that machinery." Not many men could furnish such a complete demonstration of their knowledge and skill concerning the machinery with which they worked. In speaking of his experience, in that part of the mill, prior to the accident, he said: "I went down and put the belt on once before that; and I had walked through that place a time or two I suppose. I took no notice to it when I went there and I didn't go frequently. I had no business there."

But on the subject of his previous knowledge there is some conflict of testimony. We therefore assume the verdict has established he did not know the conditions that would confront him in the basement. Why, then, did he go there? Not, as we have already seen, because of any order from his superior. He could have remained where his own knowledge and experience protected him; he could have sent another. He did neither. Having undertaken, as the result of his own judgment, to go, he must have realized he could not prudently attempt the work he wished to perform with the machinery running at normal speed. The means for stopping it temporarily were at his hand. The evidence shows no rule or regulation prohibiting his use of such means. Of course if he slackened the speed to the point of

safety his purpose would have been accomplished, and this he attempted to do. He relied on his own judgment and experience to determine when he had reached that point. That he made an unfortunate error in thus stopping short of what was manifestly safe, the event that followed establishes.

The principles that control what are commonly called "negligence cases" are few and have been many times declared. In such cases, more perhaps than in any other branch of the law, it is true that each case stands upon its own facts. Looking, then, at the material facts of this case, in a light as favorable to the plaintiff as he is able to state them, we are driven to the conclusion that the proximate cause of his injury was his lack of that due regard for his own safety which the law imposes on everyone who seeks its aid to recover compensation from another for the consequences of an injury. Of course, the extent of this obligation varies with the age, knowledge and experience of him on whom it rests. Unfortunately it seems to be true that those who most frequently have to face danger become, in time, oblivious or careless of its presence. When, however, injury results from such a cause, although we may deplore it, we cannot saddle its consequences upon another.

Judgment reversed.